Citation Nr: 1829631 
Decision Date: 06/27/18 Archive Date: 07/02/18

DOCKET NO. 10-25 522 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO)
in Chicago, Illinois


THE ISSUES

1. Entitlement to an initial rating greater than 0 percent prior to October 27, 2014, and a rating in excess of 70 percent from that date for posttraumatic stress disorder (PTSD) with major depressive disorder (MDD).

2. Entitlement to a rating greater than 20 percent for degenerative joint disease of the right ankle (right ankle disability).

3. Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected right ankle disability and/or PTSD with MDD.


REPRESENTATION

Appellant represented by: Robert V. Chisholm, Attorney



WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

Sarah Campbell, Associate Counsel


INTRODUCTION

The Veteran, who is the appellant, had active duty from July 1973 to June 1975. 

This appeal to the Board of Veterans' Appeals (Board) arose from April 2008 and June 2014 rating decisions. 

In the April 2008 rating decision, the RO, inter alia, denied a rating greater than 20 percent for a right ankle disability and denied service connection for PTSD, as well as an acquired psychiatric disorder other than PTSD, to include as secondary to service-connected disabilities. In May 2008, the Veteran filed a notice of disagreement (NOD). In May 2010, the RO issued a statement of the case (SOC), and the Veteran subsequently filed a substantive appeal (via a VA Form 9, Appeal to the Board of Veterans' Appeals).
In December 2012, the Veteran testified during a Board video-conference hearing before the undersigned Veterans Law Judge; a transcript of the hearing is of record. 

In April 2013, the Board remanded the higher rating claim for a right ankle disability to the agency of original jurisdiction (AOJ) for further action, to include additional development of the evidence. After accomplishing further action, the AOJ continued to deny the claim (as reflected in a May 2013 supplemental SOC (SSOC)) and returned this matter to the Board for further appellate consideration. 

In May 2014, the Board denied a rating greater than 20 percent for the right ankle disability, and remanded the claim for service connection for an acquired psychiatric disorder other than PTSD, to include as secondary to service-connected disability(ies). 

While on remand, in a June 2014 rating decision, the RO granted service connection for PTSD, and assigned a 50 percent rating, effective May 23, 2007 (the receipt date of the claim for service connection. Subsequently, in an October 2014 rating decision, the AOJ granted the claim for service connection of an acquired psychiatric disorder other than PTSD-specifically, major depressive disorder-and recharacterized the service-connected psychiatric disability as PTSD with MDD. The AOJ assigned a 50 percent rating from May 23, 2007, and awarded a 70 percent rating, effective October 27, 2014. In June 2015, the Veteran filed a notice of disagreement (NOD). In May 2017, the RO issued a SOC the Veteran filed a substantive appeal (via a VA Form 9, Appeal to the Board of Veterans' Appeals) that same month.

With respect to the right ankle claim, the Veteran appealed the May 2014 Board decision denying an increased rating to the United States Court of Appeals for Veterans Claims (Court). In May 2015, the Court granted a joint motion for remand ("joint motion") filed by representatives for both parties, vacating the Board's decision, and remanding the claim to the Board for further proceedings consistent with the joint motion. 

In December 2015, the Board remanded the higher rating claim for a right ankle disability to the AOJ for further action, to include additional development of the evidence and expanded the appeal to include the issue of a TDIU as part and parcel of the claim for an increased rating for the right ankle, consistent with Rice v. Shinseki, 22 Vet. App. 447 (2009). After accomplishing further action, the AOJ continued to deny the claim (as reflected in an April 2017 supplemental SOC) and returned this matter to the Board for further appellate consideration. 

In the May 2017 substantive appeal, the Veteran's attorney also contended that the Veteran is entitled to a TDIU as part and parcel of the claim for higher ratings for his PTSD with MDD, consistent with Rice, 22 Vet. App. 447. Thus, the Board has now recharacterized the TDIU claim as set forth on the title page.

The Board also notes that the Veteran's attorney submitted several Privacy Act requests from May to October 2017 for Social Security Administration records, however, in a November 2017 correspondence, the Veteran's attorney cancelled this request. In a January 2018 correspondence, the Veteran's attorney indicated that the Veteran wished to waive the 90-day period and requested that the Board decide as soon as possible in response to the January 2018 Board letter. 
While the Veteran previously had a paper claims file, this appeal is now being processed utilizing the paperless, electronic Veterans Benefits Management System (VBMS) and Virtual VA (Legacy Content Manager) claims processing systems. 

The Board's decision addressing the claim for higher ratings for PTSD with MDD is set forth below. The claims for a rating greater than 20 percent for right ankle disability and for a TDIU are addressed in the matter following the order; these matters are being remanded to the AOJ. VA will notify the Veteran when further action, on his part, is required.


FINDINGS OF FACT

1. All notification and development actions needed to fairly adjudicate the claim herein decided have been accomplished.

2. The collective evidence is, at least, relatively evenly balanced on the question of whether, from the May 23, 2007, effective date of the award of service connection through October 26, 2014, the Veteran manifested psychiatric symptoms of the type and extent, frequency and/or severity (as appropriate) to result in occupational and social impairment with major deficiencies in most areas, such as family relations, judgment, thinking, and mood.

3. At no pertinent point prior to October 27, 222014 did the Veteran have symptoms of the type and extent, frequency and/or severity (as appropriate) to indicate total occupational and social impairment due to PTSD with MDD been shown.

4. The applicable schedular criteria are adequate to evaluate the Veteran's service-connected PTSD with MDD at all pertinent points. 



CONCLUSIONS OF LAW

1. Resolving all reasonable doubt in the Veteran's favor, the criteria for an initial 70 percent but no higher rating, for PTSD with MDD, from May 23, 2007, through October 26, 2014, are met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107 (2012); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.2, 4.3, 4.7, 4.10, 4.125, 4.126, 4.130, Diagnostic Code (DC) 9411 (2017).

2. The criteria for a rating greater than 70 percent for PTSD with MDD are not met at any pertinent point. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.2, 4.3, 4.7, 4.10, 4.125, 4.126, 4.130, DC 9411.


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Due Process Considerations

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C. §§ 5100, 5102, 5103, 5103A, 5106, 5107, and 5126) includes enhanced duties to notify and assist claimants for VA benefits. VA regulations implementing the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a). 

After a complete or substantially complete application for benefits is received, notice requirements under the VCAA essentially require VA to notify a claimant of any evidence that is necessary to substantiate the claim, as well as the evidence that VA will attempt to obtain and which evidence he or she is responsible for providing. See, e.g. Pelegrini v. Principi, 18 Vet App. 112 (2004) and Quartuccio v. Principi, 16 Vet. App. 183 (2002) (addressing the duties imposed by 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159(b)). 

VCAA-compliant notice must be provided to a claimant before the initial unfavorable decision on a claim for VA benefits by the AOJ. Id.; Pelegrini, 18 Vet. App. at 112. See also Disabled American Veterans v. Secretary of Veterans Affairs, 327 F.3d 1339 (Fed. Cir. 2003). However, the VCAA notice requirements may, nonetheless, be satisfied if any errors in the timing or content of such notice are not prejudicial to the claimant. Id. 

In this case, July 2007 and January 2008 pre-rating letters provided notice to the Veteran regarding the information and evidence needed to substantiate his claim (which was then a claim for service connection for PTSD). These letters also informed the Veteran of what information and evidence must be submitted by him and what information and evidence would be obtained by VA, and provided him with general information pertaining to VA's assignment of disability ratings and effective dates, as well as the type of evidence that impacts those determinations. The April 2008 rating decision reflects the initial adjudication of the claim after issuance of these letters. 

After the June 2014 award of service connection for PTSD and the Veteran's disagreement with the initial rating assigned, no additional notice for the downstream, initial rating issue was required under 38 U.S.C. § 5103A. See VAOPGCPREC 8-2003, 69 Fed. Reg. 25180 (May 5, 2004). Nonetheless, a May 2018 SOC set forth the applicable criteria for higher ratings for PTSD (the timing and form of which suffices, in part, for Dingess/Hartman). Notably, the Veteran has not alleged or demonstrated any prejudice regarding the content or timing of any notice provided. See Shinseki v. Sanders, 129 S. Ct. 1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, falls upon the party attacking the agency's determination); Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

The record also reflects that VA has made reasonable efforts to obtain or to assist in obtaining all relevant records pertinent to the matter herein decided. Pertinent medical evidence associated with the claims file consists of the Veteran's service treatment records, private treatment records, VA treatment records, Social Security Administration (SSA) disability records, and reports of VA examinations. Also of record and considered in connection with the appeal are the various written statements provided by the Veteran and his attorney. The Board finds that no further action to develop the claim herein decided, prior to appellate consideration, is required.

In summary, the duties imposed by the VCAA have been considered and satisfied. There is no additional notice that should be provided, nor is there any indication that there is additional existing evidence to obtain or development required to create any additional evidence to be considered in connection with the claim herein decided. As such, there is no prejudice to the Veteran in the Board proceeding to a decision on this claim, at this juncture. See Mayfield v. Nicholson, 20 Vet. App. 539, 543 (2006) (rejecting the argument that the Board lacks authority to consider harmless error). See also ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998).

II. Higher Rating 

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities, which is based on average impairment of earning capacity. 38 U.S.C. § 1155; 38 C.F.R. Part 4. Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the veteran. 38 C.F.R. § 4.3.

A veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where entitlement to compensation already has been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). However, where, as here, the question for consideration is entitlement to a higher initial rating assigned following the grant of service connection, evaluation of the medical evidence since the effective date of the grant of service connection and consideration of the appropriateness of "staged rating" (assignment of different ratings for distinct periods of time, based on the facts found) is required. Fenderson, 12 Vet. App. at 126. As the AOJ has already assigned staged ratings for the Veteran's PTSD with MDD, the Board will consider the propriety of the rating at each stage, as well as whether any further staged rating is warranted.

In this case, the Veteran's PTSD with MDD has been assigned a 50 percent rating prior to October 27, 2014, and 70 percent from that date; both ratings were assigned under DC 9411. However, the actual criteria for rating psychiatric disabilities other than eating disorders are set forth in a General Rating Formula for Mental Disorders (General Rating Formula). See 38 C.F.R. § 4.130.

Under the General Rating Formula, a 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 

To warrant the next higher, 70 percent rating, the evidence must show occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); and an inability to establish and maintain effective relationships. 

A 100 percent rating is warranted for total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name. 

As the United States Court of Appeals for the Federal Circuit has explained, evaluation under 38 C.F.R. § 4.130 is "symptom-driven," meaning that "symptomatology should be the fact-finder's primary focus when deciding entitlement to a given disability rating" under that regulation. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 116-17 (Fed. Cir. 2013). However, the symptoms listed are not exhaustive, but rather "serve as examples of the type and degree of symptoms, or their effects, that would justify a particular rating." Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). In the context of determining whether a higher disability evaluation is warranted, the analysis requires considering "not only the presence of certain symptoms[,] but also that those symptoms have caused occupational and social impairment in most of the referenced areas"-i.e., "the regulation . . . requires an ultimate factual conclusion as to the Veteran's level of impairment in 'most areas.'" Vazquez-Claudio, 713 F.3d at 117-18; 38 C.F.R. § 4.130.

When evaluating a mental disorder, the Board must consider the "frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission," and must also "assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination." 38 C.F.R. § 4.126(a). 

Psychiatric examinations frequently included assignment of a Global Assessment of Functioning (GAF) score. According to the Fourth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health illness There is no question that the GAF score and interpretations of the score are important considerations in rating a psychiatric disability. See e.g., Richard v. Brown, 9 Vet. App. 266, 267 (1996); Carpenter v. Brown, 8 Vet. App. 240 (1995). However, the GAF score assigned in a case, like an examiner's assessment of the severity of a condition, is not dispositive of the evaluation issue; rather, the GAF score must be considered in light of the actual symptoms of the veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a). [Parenthetically, the Board notes that the revised DSM-5, which among other things, eliminates GAF scores, applies to claims certified to the Board after August 4, 2014. See 79 Fed. Reg. 45, 093 (Aug. 4, 2014).]

Turning to the relevant evidence of record, an April 2001 SSA disability determination reflects the Veteran was awarded disability benefits due to his cervical and lumbar degenerative disc disease (primary), bilateral carpel tunnel syndrome (secondary), and gastroesophageal reflux disease. 

An April 2007 VA psychiatry treatment note reflects the Veteran's complaints of depressed mood, difficulty sleeping, and a great deal of anxiety. The Veteran denied delusions or hallucinations. He was assigned a GAF score of 50.

The Veteran's May 2007 claim for service connection reflects the Veteran reported chronic depression and anxiety. 

A June 2007 VA treatment record reflects that he had reoccurring nightmares and he had trouble sleeping. 
In a July 2007 VA treatment record, the Veteran presented a history and symptoms of PTSD and a PCL score of 61, which was noted as significant for PTSD. He requested counseling for his nightmares. He experienced repeated disturbing memories thoughts or images of a stressful experience from the past, repeated disturbing dreams of a stressful experience from the past, suddenly acting or feeling as if a stressful experience were happening again, feeling very upset when something reminded him of a stressful experience from the past, having physical reactions (e.g., heart pounding, trouble breathing, or sweating) when something reminded him of a stressful experience from the past, avoided thinking about or talking about a stressful experience from the past or avoided having feelings related to it, avoided activities or situations because they reminded him of a stressful experience from the past, trouble remembering important parts of a stressful experience from the past, loss of interest in things that he used to enjoy, feeling distant cut off from other people, feeling emotionally numb or being unable to have loving feelings for those close to him, feeling as if his future will somehow be cut short, trouble falling or staying asleep, feeling irritable or having angry outbursts, having difficulty concentrating, being super alert or watchful on guard, and feeling jumpy or easily startled.

The Veteran underwent a VA examination in November 2007. The Veteran reported that he stopped working in 1994 due to his migraines and hand problems. He reported being married for 29 years and has one son. He stated that he had frequent disputes with his wife and stated that he does not socialize with too many people and typically stays home. His activities and leisure pursuits included television watching, attending a Veterans' group once a month, and taking his dogs out for walks. In terms of substance use, he had been sober for the past ten years. He denied any history of inpatient psychiatric hospitalization and was receiving outpatient psychiatric care for the first time in the form of counseling and some medication management. He had a history of assaultiveness. He was in two fights that required police intervention and also a fight with his son. By his report he received a fine and on one instance and charges were dropped in the other instances. He also notes that he has a history of suicidal ideation and at one time during the 1980s, he drove his car into a tree. He stated he had other suicidal ideations periodically about two to three times a month, however, he has not and does not have any plans or intent to carry out this behavior. In summary, the examiner indicated his current psychosocial functioning was moderately impaired and he was unemployed and unable to work due to his migraines and depression. He had adequate hygiene. He had ongoing disputes with his wife and he was quite isolated from other people and had limited social and recreational activities.

There was no evidence of impaired thought process or communication, delusions or hallucinations. He made good eye contact during the interview and interacted appropriately. He stated that he had suicidal ideations once or twice a month without a plan or intent. He denied homicidal ideation plan or intent. His personal hygiene was adequate, although he stated that he sometimes does not shower for 2-3 days just because he does not really care to. He was oriented to person, place, and time. He described some short-term memory difficulties that appeared to be secondary to concentration difficulties related to some depression that he is experiencing. His long-term memory was within normal limits. He described some obsessive and ritualistic behavior in the form of unplugging his toaster daily and having four locks on his basement door and front door. His rate and flow of speech was within normal limits and goal directed. He described a history of panic attacks two to three times a month that involved some shakiness, sweating, and dizziness. He described fairly extensive symptom picture for depression. His depressive symptoms included irritable mood, anhedonia, sleep disturbance in the form of getting 4-5 hours of sleep a night, and having onset and wakefulness. His energy and motivation was low and he had some difficulty with concentration. He described being quite negative and pessimistic and that he ruminates and worries a lot about money and his relationship with his wife. As noted above, he had suicidal ideation without plan or intent once or twice a month. The Veteran had been experiencing depression for the last four to five years. 

By his report, he has had some re-experiencing symptoms and minimal avoidance symptoms. He reported avoiding news or media reports related to the current war in Iraq and he was distressed by hearing the helicopters that go near his house. He avoided people and isolated himself. He had persistent symptoms of increased arousal that have been ongoing for some time and had worsened. He has difficulty falling or staying asleep, irritability, and outbursts of anger, difficulty concentrating, hypervigilance, and an exaggerated startle response. His PTSD symptoms were considered mild. A GAF of 55 was assigned. 

The examiner indicated that the Veteran suffered from mild posttraumatic stress disorder with insignificant functional impairment according to the symptoms noted above. The PTSD symptoms are not severe enough to require continuous medication, nor were the PTSD symptoms severe enough to interfere with occupational and social functioning. However, the Veteran's depression and migraine headaches were severe enough to require continuous medication and severe enough to interfere with social and occupational functioning. 

A January 2008 VA treatment reflects the Veteran was primarily dealing with ongoing medical concerns and when seen a month later by psychiatry with a diagnosis of multiple mild brain injuries, acute stress disorder and anxiety, schizotypal personality disorder possible. A GAF of 50 was assigned. A PTSD screen was positive.

January 2009 to April 2010 VA treatment records reflect that the Veteran was diagnosed with major depression, refractory, PTSD, Axis II deferred, and a GAF of 50 was assigned. 

February to May 2011 VA treatment reflects a diagnosis of major depression, anxiety vs PTSD and a GAF score of 45 was assigned. The Veteran was continuously very irritable and continued to have depressive and PTSD symptoms.
He reported chronic, sporadic, passive suicidal ideation without intent or plan. He reported these have not changed in frequency, intensity, or duration recently and adamantly denied current intent. He reported significant hopelessness and decreased energy during the day, and getting only 4 hours per night. His appearance was adequate, affected slightly restricted, mood was depressed and irritable, insight was fair, and judgment was good.

A July 2011 VA treatment record reflects the Veteran's report of ongoing nightmares, flashbacks, hypervigilance, and he denied any suicidal or homicidal ideation. He denied auditory or visual hallucinations, paranoia, and delusions. He was living with his wife and she was very supportive. He reported continued sleep problem and his energy and concentration were low. He also reported slow motivation. A GAF score of 55-60 was assigned. He was alert and oriented x 3, neatly and appropriately dressed and groomed, pleasant and cooperative with examiner with good eye contact. Speech and psychomotor were within normal limits, thought flow was linear and coherent. He denied auditory or visual hallucinations, delusions, and denied suicidal and homicidal ideations. His cognitive function and insight were grossly intact. His judgment was conventionally intact.

An October 2011VA treatment record reflects the Veteran reported strange dreams, depression, off and on chronic suicidal thoughts, low motivation and self-esteem, irritability, and frequent anger outbursts. He reported arguing with his wife too much. A depression screen was suggestive of severe depression. A GAF score of 60 was assigned. 

A December 2011 VA treatment record reflects the Veteran's mood was still low and depressed and he was having financial stressors. He reported feeling fatigue and tiredness all the time. His appetite was variable, and he had poor energy and concentration. He had continuous sleep problems with difficulty maintaining sleep. He was experiencing vivid dreams. He denied any current suicidal or homicidal ideations. He reported irritability and sometimes anger outbursts. He was neatly and appropriately groomed, interactive, cooperative, pleasant, oriented x 4 and alert, and judgement and insight were normal. He denied hallucinations or delusions. 
March 2012 to May 2012 VA treatment record reflects continued symptoms of depression, anxiety, low energy and concentration, and irritability and anger outbursts. He denied current suicidal and homicidal ideations. The PTSD screen was positive. The depression screen was suggestive of severe depression. Mental status examination was normal with no hallucinations or delusions, and intact insight, judgment, and normal speech. 

A September 2012 VA treatment record notes a GAF score of 60. An alcohol screen was negative and a PTSD screen was positive. His depression screen was suggestive of severe depression.

An April 2013 examiner assigned a GAF score of 50-55. The Veteran noted that he was having some ongoing marital issues, still having difficulty sleeping, and reported that nightmares had decreased. A PTSD screen was positive. A depression screen was suggestive of severe depression.

A May 2013 VA treatment record notes that Veteran was alert and oriented, and had a walking stick due to an ankle problem, and he was appropriately dressed and groomed. He was pleasant and cooperative, and appeared to have some insight into issues. His speech was quiet and somewhat muffled, affect congruent to mood, and his thought processes were logical and linear. He stated that he stayed away from people and did not want to socialize; that he and his wife have conflict, that he felft agitated at times, that he was sad, and "mopes," and that he hadlack of interest in things. He did not engage in activities outside of home like he used to and mainly watched television and tried to walk. 

A May 2013 VA examination report notes that the Veteran experienced depressed mood, anxiety, chronic sleep impairment, mild memory loss, such as forgetting names, directions or recent events, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work like setting. His additional symptoms also included difficulty falling or staying asleep, irritability or outbursts of anger, difficulty concentrating, feeling of detachment or estrangement from others, restricted range of affect (e.g., unable to have loving feelings). In summary, the examiner indicated the Veteran endorsed symptoms of persistent re-experiencing, persistent avoidance, and persistent increased arousal consistent with PTSD. The Veteran reported nightmares frequently of the head injury he suffered in the service, as well as flashbacks to the man dying in the room next day him in 2007. The Veteran also noted avoidance of anything related to military issues. He noted a sense of detachment from others at times particularly over the last several years. He was also quick to anger. The examiner concluded his symptoms resulted in occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation.

A July 2013 VA treatment record reflects that the prescription for Aripiprazole was increased from 10 to 15mg. The Veteran reported that his mood was a little better but still depressed. He had trouble sleeping at nights. He reported his nightmares decreased to three to four times a month. He also reported hypervigilant and startle response with loud noises. He reported he still argues with his wife about every small thing. He was stressed out and overwhelmed due to financial and relationship problems. He said sometimes he cannot talk with his wife for a couple of days. He reported feeling fatigue and tiredness all the time. His appetite was variable, energy and concentration was poor. He denied any current suicidal or homicidal ideations. He reported irritability and anger outbursts. He lived with his wife and had been married for 33 years. He has one son who is 35 years old and he has six grandchildren. 

An August 2013 VA treatment record reflects the Veteran's reportthat he stayed away from people and did not want to socialize, and he and his wife had conflict. He reported a work history of driving a truck and forklift, and doing warehouse work. The examiner noted that the Veteran had a positive support system with his son and wife, but that he did not have relationships with his siblings on the east coast. He described snapping in the moment with rapid anger escalation resulting in shaking, stuttering, nervousness, feelings of hatred, and inability to stop angry thoughts. He reported that he removed himself from situation, but continued to feel anger and cannot stop thinking about it. He reported one prior incident i where the police were called when an object he threw hit his son (son was an adult at time and his girlfriend called police - no charges filed). He reported he had not lashed out physically at anyone for years, but does still throw things on occasion. A GAF score of 50-55 was assigned. 

The remainder of the 2013 VA treatment records reflect consistent symptoms of sleep problems, arguments with his wife, lack of interests in things, increased nightmares, depression, does not want to socialize with others, and irritability and anger outbursts with normal mental status examinations. GAF scores of 50-60 were assigned and his MDD was described as moderate to severe. 

A January 2014 VA treatment record reflects that the Veteran's psychiatric medications were increased. The Veteran reported that he felt better compared to previous visit. He was getting a little depressed sometimes and had trouble staying a sleep. He reported nightmares decreased to two to three times a month. He also reported hypervigilant and startle response with loud noises. His relationship with his wife was still rocky, as they get into an altercation over every little thing. He was stressed out and overwhelmed due to financial and relationship problem. He reported feeling fatigue and tiredness all the time. His appetite was variable, energy, and concentration were poor. He reported anhedonia, no motivation, very poor self-esteem. He denied any current suicidal or homicidal ideation, but reported irritability and anger outburst easily. A depression screen revealed severe depression. 

An April 2014 VA treatment record reflects the Veteran's reported that he was depressed sometimes and that his mood was a little better. His relationship with his wife was getting better. He reported continued fatigue, tiredness, poor concentration and energy, irritability and anger outbursts, although a little better than before. He denied and current suicidal or homicidal ideations. A mental status examination was normal. 

A September 2014 VA treatment record reflects that the Veteran started anger management classes. 

2014 VA treatment records reflect continued severe depression and anxiety. He reported continued arguments with his wife, depressed mood, irritability, and some angry outbursts. His mental status examinations were normal. He denied suicidal and homicidal ideations and hallucinations and delusions. 

An October 2014 VA examination report reflects the Veteran reported continued nightmares about three to four times a week. He reported intrusive thoughts, avoidance, and detachment. He reported that he did not socialize anymore, that he gets depressed and that his wife tries to help him, but it does not work. He reported problems with anger and sleeps five to six hours a night. He reported he stays home watching TV and had no regular activities or hobbies. He stated that his son comes over to help with the yard and that although he tries to do things, he gives up. His 
PHQ9 score was 21, indicative of a severe level of depression. He denied any suicidal ideations, plan, or intent; otherwise he endorsed all symptoms of depression as being present the majority of days in the last two weeks. The examiner noted symptoms of depressed mood, anxiety, panic attacks more than once a week, chronic sleep impairment, mild memory loss, such as forgetting names, directions or recent events, flattened affect, impaired abstract thinking, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationship, and difficulty in adapting to stressful circumstances, including work or a work like setting. The examiner concluded his symptoms resulted in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, and/or mood.

A January 2015 VA treatment record notes that the Veteran was generally doing better in communicating with his wife and with anger when driving. He reported that he felt isolated during holidays and that his wife did not want him telling family that he has PTSD. He reported feeling very depressed and anxious recently and was fearful about losing VA benefits and also had elevated difficulty with sleep. 

An August 2015 VA examination reflects that the Veteran reported the same symptoms as described on October 2014 VA examination. He reported that his wife described his as being unemotional. He denied any current suicidal ideations, plan, or intent. The PHQ 9 score was 20, indicative of a severe level of depressive symptoms. The examiner noted symptoms of depressed mood, anxiety, panic attacks more than once a week, chronic sleep impairment, mild memory loss, such as forgetting names, directions or recent events, flattened affect, impaired abstract thinking, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationship, and difficulty in adapting to stressful circumstances, including work or a work like setting. The examiner concluded his symptoms resulted in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, and/or mood.

The examiner noted that the Veteran's reported symptoms were generally consistent with what he described at the time of his last examination in October 2014 and that his symptoms would interfere with attendance and performance at work. He would have periods of missed work, reduced reliability, and productivity, and may have periodic interpersonal conflicts or be avoidant in terms of his interactions with coworkers. He was on several psychiatric medications, although his records indicate good tolerability of treatments and do not describe adverse side effects that would interfere with his ability to work at this time.

An August 2015 private vocational assessment reflects the Veteran's report of staying home, other than to see his physicians or very short shopping trips with his wife. The vocational consultant indicated that the Veteran stopped working as a truck driver due to poor concentration, anxiety with driving due to fear of an accident, as well as his additional service-connected disabilities. She noted that the Veteran's symptoms came to a head when he witnessed the death of a hospital patient during his stay in the hospital, which caused flashbacks to his military service. 

VA treatment record dated in 2015 and 2016 reflect that the Veteran completed anger management classes, but that he still got into nto arguments with his wife. His concentration was poor and he reported irritability and anger outbursts, anxiety, poor memory, and continued nightmares, and sleep problems. His mood was described as "crappy and down." Mental status examinations were normal and the Veteran was described as pleasant, interactive, and cooperative. It was noted that the depression screens reflect severe depression.

Considering all the foregoing, including the medical records and the lay statements of record, the Board finds that, with resolution of all reasonable doubt in the Veteran's favor, for the period from May 23, 2007, through October 26, 2014, an initial 70 percent rating for the Veteran'a PTSD with MDD is warrantedIn this regard, the above-described evidence reflects that the Veteran has had symptoms and overall impairment that correspond to the symptoms listed in the rating criteria as examples of those of the type and extent, frequency and/or severity (as appropriate) contemplated in the assignment of a 50 percent rating, as well as a 70 percent rating, under the General Rating Formula. . In particular, the Veteran's symptoms have included flattened affect, circumstantial speech, memory impairment, impaired judgment and thinking, disturbances in motivation and mood, difficulty in establishing and maintaining effective relationships, suicidal ideation, near-continuous depression, impaired impulse control, difficulty in adapting to stressful circumstances, and inability to establish and maintain effective relationships. Moreover, the Veteran has indicated that he has had significant difficulties socially and occupationally due to his PTSD with MDD, and medical professionals have provided opinions as to the severity of such symptoms and to the level of functional impairment due to such symptoms (to include GAF scores), ranging from moderate to severe.
In sum, as the overall evidence indicates that the Veteran has experienced psychiatric symptoms attributable to PTSD with MDD indicative of the moderate to severe impairment of social and occupational functioning, the evidence is, at least, relatively evenly balanced on the question of whether the Veteran's disability picture has more closely approximated the criteria for a 70 percent rating for the period under consideration. As such, and with resolution of all reasonable doubt in the Veteran's favor, the Board find that entitlement to an initial 70 percent rating for PTSD with MDD, for the period from May 23, 2007, through October 26, 2014, is established.

However, the Board finds that the Veteran's PTSD has not met, or more closely approximated, the criteria for a maximum, 100 percent rating at any point since the effective date of the award of service connection. 

In this regard, at no pertinent point has the Veteran's PTSD with MDD been shown to result in total occupational and social impairment, due to such symptoms as gross impairment in thought processes or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others, intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene), disorientation to time or place, or memory loss for names of close relatives, own occupation, or own name. The Board notes that even though the Veteran indicated experiencing suicidal ideations, such ideation was specifically noted or indicated to be without any intent to act, indicating no danger, let alone persistent danger, of the Veteran hurting himself or others. Also, the Board notes that even though the Veteran indicated experiencing some memory impairment, such impairment did not rise to the degree of memory loss for names of close relatives, own occupation or own name. In addition, the Veteran has consistently denied having hallucinations or delusions. Also, the Veteran has consistently been noted to be oriented to time and place and to otherwise have coherent speech and thought processes. It has also been consistently indicated that the Veteran is able to perform activities of daily living, has adequate hygiene, and has no inappropriate behavior. He was described as cooperative, interactive, and pleasant. Thus, the Board finds that, at no pertinent point, has the Veteran manifested symptoms of the type, and extent, frequency, and/or severity (as appropriate) contemplated by the maximum, 100 percent schedular rating.

The Board further finds that none of the assigned GAF scores alone, provide a basis for a higher, 100 percent rating. As noted, the GAF scores assigned have ranged from 45 to 60-with most scores assigned in the 50 range. The range of scores assigned are indicative of moderate to severe symptomatology, with the majority of the scores in the 50 range consistent with the level of impairment contemplated in the assigned 70 percent rating. Notably, even the lowest assigned score of 45, which indicates "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," is consistent with no more than the level of impairment contemplated in the assigned 70 percent rating. Further, the Board notes that in a September 2015 correspondence, the Veteran's attorney contended that his symptoms warrant at least a 70 percent rating. 

The Board acknowledges that the Veteran has been retired throughout the entire period under consideration in this appeal, and that he has asserted that he retired, in part, due to symptoms associated with his service-connected psychiatric disability. However, the medical evidence of record indicates that the Veteran has been unable to work due to his multiple service-connected disabilities, as well as other nonservice connected disabilities, as noted in the August 2015 vocational assessment, the SSA records, and the Veteran's multiple lay statements and statements submitted by his attorney on his behalf, to include April 2017 correspondence and the May 2017 substantive appeal.
 
Also, the August 2015 examiner found the Veteran's symptoms would interfere with attendance and performance at work, have periods of missed work, and concluded that it would result in reduced reliability and productivity; on that basis he examiner concluded that the Veteran's disability only met the criteria for a 70 percent rating under the General Rating Formula. The Board likewise finds that total occupational impairment due solely to the Veteran's psychiatric disability has not been shown. Although the Veteran has reported limited social activities and avoidance of social gatherings, he has remained married throughout the claim period, has reported good relationships with his wife and son. He described having a good support system. 

Accordingly, the Board finds that no more than the assigned 70 percent rating is warranted in this case. The Board reiterates that the symptoms listed in the rating schedule are essentially examples of the type and degree of symptoms indicative of the level of impairment required for each such rating, and that the Veteran need not demonstrate those exact symptoms to warrant a higher rating. See Vazquez-Claudio, supra and Mauerhan, supra. However, as discussed above, the Board finds that the evidence of record simply does not show that the Veteran has manifested symptoms of the type and extent, frequency and/or severity, as appropriate, to result in a level of impairment that meets, or more nearly approximates, the level of impairment contemplated by the maximum, 100 percent rating under VA's rating schedule. 


For all the foregoing reasons, the Board finds that, while the criteria for an initial 70 percent rating for the Veteran's PTSD are met for the period from May 23, 2007, through October 26, 2014, a rating greater than 70 percent must be denied. The Board has resolved reasonable doubt in the Veteran's favor in assigning a higher initial 70 percent rating for PTSD for the period in question, but finds that the preponderance of the evidence is against assignment of any higher rating at any pertinent point. See 38 U.S.C. § 5107(b); 38 C.F.R. §§ 3.102, 4.3; Gilbert v. Derwinski, 1 Vet. App. 49, 53-6 (1990).


ORDER

An initial 70 percent rating for PTSD with MDD, for the period from May 23, 2007, through October 26, 2014, is granted, subject to the legal authority governing the payment of VA compensation.

A ratting greater than 70 percent for PTSD with MDD is denied.


REMAND

Unfortunately, the Board finds that further action in this appeal is warranted, even though such will, regrettably, further delay an appellate decision on the remaining matters on appeal. 

A remand by the Board confers upon a veteran, as a matter of law, the right to compliance with the remand instructions, and imposes upon VA a concomitant duty to ensure compliance with the terms of the remand. See Stegall v. West, 11 Vet. App. 268, 271 (1998).

With regard to the right ankle disability, in the December 2015 Board remand, the Board directed the examiner to specifically determine whether the Veteran has had instability as a distinct disability at any point pertinent to the claim on appeal. . The May 2016 VA examiner indicated that instability was noted in the right ankle, but also notes in the remarks section that there was no objective evidence of ankle instability on examination. Thus, the examiner's findings are inconsistent with regard to the presence or absence of instability. The examiner also failed to address range of motion findings reflected in August 2015 VA examination report, as requested.

See Stegall, supra. 

Moreover, the May 2016 VA examiner did not indicate whether the range of motion testing conducted included active and passive motion, in weight-bearing and non-weight-bearing. See 38 C.F.R. § 4.59 (2017); see also Correia v. McDonald, 28 Vet. App. 158 (2016).

As for the matter of the Veteran's entitlement to a TDIU, given the development being requested on the increased rating claim-which could impact the claim for a TDIU-this matter is being remanded, as well. Cf. Parker v. Brown, 7 Vet. App. 116 (1994); Harris v. Derwinski, 1 Vet. App. 180, 183 (199). The Board also finds that further development of the TDIU claim is warranted.

As s noted in December 2015, the Board remanded the claim for a TDIU so that the AOJ could address the Veteran's entitlement to a TDIU due to the right ankle disability for the entire period under consideration. However, since the December 2015 remand, the Veteran perfected an appeal of the claim for higher ratings for PTSD with MDD (as addressed above). As such, the TDIU claim before the Board has now been expanded to encompass impairment due to service-connected right ankle and/or psychiatric disability.

The Board further notes that while the TDIU claim was in remand status, the Veteran raised the matter of his entitlement to a DIU due to his service-connected PTSD with MDD and his other service-connected disabilities, and that in an April 2017 SOC, the AOJ Veteran's entitlement to a TDIU due to hisl service-connected disabilities (to include disabilities not currently on appeal). However, consistent with Rice and the prior remand, the Board has jurisdiction only over the matter of the Veteran's entitlement to a TDIU due to the disabilities for which higher ratings are sought. Also with respect to the TDIU matter, the Board notes that the functional effects (or lack thereof) of each individual disabilitywere recorded in various VA examination reports of record--August 2015 (PTSD and ankle) and May 2016 examination (ankle) report. However, the May 2016 examiner failed to provide a rationale in concluding that the Veteran's right ankle, to include wearing an ankle brace, would not prevent him from driving a truck. 

The Board further finds that, as the Veteran now meets the percentage requirements for a schedular TDIU, pursuant to 38 C.F.R. § 4.16(a), on remand, comments should be obtained from a physician with occupational and/or vocational expertise addressing the individual and combined functional effects of the Veteran's service-connected psychiatric and right ankle disabilities on his ability to perform the acts required for gainful employment. The AOJ should only arrange for further examination, in this regard, if one is deemed necessary in the judgment of the individual designated to provide the requested comments. 

Prior to undertaking action responsive to the above, to ensure that that all due process requirements are met and the record with respect to the remaining claims is is complete, the AOJ should undertake appropriate action to obtain and associate with the claims file all outstanding, pertinent records.

As for VA records, the claims file reflects that the Veteran has been receiving treatment from the Madison VA Medical Center (VAMC) and that records dated through March 2017 are associated with the file; however, more recent records may exist. The Board emphasizes that records generated by VA facilities that may have an impact on the adjudication of a claim are considered constructively in the possession of VA adjudicators during the consideration of a claim, regardless of whether those records are physically on file. See Sullivan v. McDonald, 815 F.3d 786, 793 (Fed. Cir. 2016). See also Dunn v. West, 11 Vet. App. 462, 466-467 (1998); Bell v. Lewinski, 2 Vet. App. 611, 613 (1992).

The AOJ should also give the Veteran another opportunity to provide additional information and/or evidence pertinent to the remaining claims on appeal, explaining that he has a full one-year period for response. See 38 U.S.C. § 5103(b)(1) (2012); but see 38 U.S.C. § 5103(b)(3) clarifying that VA may make a decision on a claim before the expiration of the one-year notice period). The AOJ should specifically request that the Veteran furnish appropriate authorization to obtain all outstanding, pertinent, private (non-VA) medical records and/or employment records.

Thereafter, the AOJ should obtain any additional evidence for which the Veteran provides sufficient information and, if necessary, authorization, following the procedures prescribed in 38 C.F.R. § 3.159.

The actions identified herein are consistent with the duties imposed by the Veterans Claims Assistance Act of 2000 (VCAA). See 38 U.S.C. §§ 5103, 5103A; 38 C.F.R. § 3.159. However, identification of specific actions requested on remand does not relieve the AOJ of the responsibility to ensure full VCAA compliance. Hence, in addition to the actions requested above, the AOJ should also undertake any other development or notification action deemed warranted prior to adjudicating the remaining claims on appeal. 


Accordingly, these matters are hereby REMANDED for the following action:

1. Obtain from the Madison VAMC all outstanding records of evaluation and/or treatment of the Veteran since March 2017. Follow the procedures set forth in 38 C.F.R. § 3.159(c) as regards requesting records from Federal facilities. All records and/or responses received should be associated with the claims file.

2. Send to the Veteran and his representative a letter requesting that the Veteran provide sufficient information concerning, and, if necessary, authorization to enable VA to obtain, additional evidence pertinent to the remaining claims on appeal that is not currently of record. Specifically request that the Veteran furnish, or furnish appropriate authorization to obtain, all outstanding, pertinent, private (non-VA) medical records and/or employment records.

Clearly explain to the Veteran that he has a full one-year period to respond (although VA may decide the claim within the one-year period).

3. If the Veteran responds, assist him in obtaining any additional evidence identified, following the current procedures set forth in 38 C.F.R. § 3.159. All records/responses received should be associated with the claims file. If any records sought are not obtained, notify the Veteran of the records that were not obtained, explain the efforts taken to obtain them, and describe further action to be taken.

4. After all records and/or responses received from each contacted entity have been associated with the claims file, arrange for the Veteran to undergo a VA ankle examination, by an appropriate physician, preferably the August 2015, or May 2016 examiner.

As the Veteran has indicated that his flare-ups have predictable triggers, and the VA examiners have indicated that an opinion regarding the functional impact of such flare-ups can only be assessed when the Veteran is examined during a flare-up, attempts should be made to have the Veteran examined later in the day, after performing activities known to trigger a flare-up.

The contents of the entire, electronic claims file, (in VBMS and Virtual VA (Legacy Content Manager)), to include a complete copy of this REMAND, must be made available to the designated individual, and the examination report should reflect consideration of the Veteran's documented medical history and assertions. All indicated tests and studies should be accomplished (with all findings made available to the examiner prior to the completion of his or her report), and all clinical findings should be reported in detail. 

The examiner should conduct range of motion testing of the left ankle (expressed in degrees) in active motion and passive motion, and on weight-bearing, and non weight-bearing, as appropriate. Range of motion testing of the right ankle should also be conducted, for comparison purposes. If the examiner is unable to conduct the required testing or concludes that the required testing is not necessary in this case, he or she should clearly so state and explain why.

The examiner should render specific findings as to whether, during the examination, there is objective evidence of pain on motion, weakness, excess fatigability, and/or incoordination. If pain on motion is observed, the examiner should indicate the point at which pain begins. 

If the Veteran is not examined during a flare-up, the examiner should also indicate whether, and to what extent, the Veteran experiences likely functional loss due to pain and/or any of the other symptoms noted above during flare-ups and/or with repeated use; to the extent possible, the examiner should express any such additional functional loss in terms of additional degrees of limited motion.

In addition, the examiner should clearly indicate whether the Veteran has any ankylosis, and, if so, the extent of any such anylosis, and (based on review of the claims file), the earliest evidence of any such ankylosis. In doing so, the examiner should address the recorded range of motion finding regarding dorsiflexion in the August 2015 VA examination report, and express an opinion as to whether the "0 to 0 degrees" was a typographical error, or if not, attempt to explain how it was determined that the Veteran had no ankylosis when he had no motion in dorsiflexion. 

The examiner should also indicate whether the Veteran has instability as a manifestation of left ankle impairment-separate and distinct from his limitation of motion-and, if so, the extent of any such instability (e.g., mild, moderate, severe). Also, based on review of the claims file, the examiner should indicate the earliest evidence of instability of record. In doing so, the examiner should consider and discuss the apparent inconsistency in the August 2015's comment that instability is not suspected when the examiner also indicated that the Veteran has to wear the ankle brace every day, for stability. 

The examiner should also specifically address any functional impact of left ankle disability on the Veteran's ability to drive a truck (which was his occupation before he stopped working). 

All examination findings/testing results, along with complete, clearly-stated rationale for the conclusions reached, must be provided.

5. After all records and/or responses received from each contacted entity, along with the report of examination addressed in paragraph 4, above, have been associated with the claims file, arrange for review of the Veteran's claims file by an appropriate physician-preferably, one with expertise in occupational and/or vocational medicine-to provide comment as to the individual and combined functional effects of the Veteran's service-connected psychiatric and ankle disabilities. 
 Only arrange for the Veteran to undergo VA examination, by an appropriate physician, if one is deemed necessary in the judgment of the individual designated to provide the requested medical findings. 
 The contents of the entire electronic claims file, to include a complete copy of this REMAND, must be made available to the designated physician, and the opinion/examination report should reflect consideration of the Veteran's documented medical history and assertions. 
 Following review of the record and any further examination of the Veteran, the physician should fully describe the functional effects of each of the disabilities under consideration-service-connected PTSD with depression and right knee disabilities-on his activities of daily living, to include employment.
 If neither service-connected disability, alone, is deemed to have functionally precluded employment, the physician must consider and describe the combined functional effects of the service-connected PTSD with depression and right ankle disabilities on his ability to perform the mental and physical actions required for gainful employment. 
 In addressing the above, the physician should consider all medical and lay evidence, to include private and VA treatment records, VA examination reports, vocational rehabilitation and employment reports, and lay statements.
The physician should describe what types of employment activities would be limited because of the service-connected PTSD with depression and/or right knee disabilities, what types of employment would not be limited (if any), and whether any limitation on employment is likely to be permanent. 
 The physician should also consider and discuss the impact/significance of associated medications, as well as the Veteran's education and workplace skills, but not the Veteran's age or distinguishable impairment from nonservice-connected disorders.
 Complete, clearly stated rationale for the conclusions reached must be provided.
6. To help avoid future remand, ensure that the requested actions have been accomplished (to the extent possible) in compliance with this REMAND. If any action is not undertaken, or is taken in a deficient manner, appropriate corrective action should be undertaken. See Stegall v. West, 11 Vet. App. 268 (1998).

7. After completing the requested actions, and any additional notification and/or development deemed warranted adjudicate the remaining claims on appeal in light of all pertinent evidence (to include all evidence added to the electronic claims file since the last adjudication of the claims) and legal authority. 

8. If any benefit(s) sought on appeal remain(s) denied, furnish to the Veteran and his representative an SSOC that includes clear reasons and bases for all determinations, and afford them an appropriate time period for response.

The purpose of this REMAND is to afford due process and to accomplish additional development and adjudication; it is not the Board's intent to imply whether any benefit requested should be granted or denied. The Veteran need take no action until otherwise notified, but he may furnish additional evidence and/or argument during the appropriate time frame. See Kutscherousky v. West, 12 Vet. App. 369 (1999).

This REMAND must be afforded expeditious treatment. The law requires that all claims remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate 



 (CONTINUED ON NEXT PAGE)



action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).




_________________________________________________
JACQUELINE E. MONROE 
 Veterans Law Judge, Board of Veterans' Appeals

Under 38 U.S.C. § 7252 (2012), only a decision of the Board of Veterans' Appeals is appealable to the United States Court of Appeals for Veterans Claims. This remand is in the nature of a preliminary order and does not constitute a decision of the Board on the merits of the appeal. 38 C.F.R. § 20.1100(b) (2017).